## THE VENTURE.

*(District Court, W. D. Pennsylvania.   May Term, 1883.)*

1. TOWAGE—TOW-BOAT ASSUMING NEEDLESS HAZARD.
    A tow-boat which voluntarily assumes a needless hazard is responsible for a consequent injury to her tow.

2. SAME—TOW-BOAT HELD ANSWERABLE FOR INJURY TO TOW.
    A tow-boat descending the Monongahela river, at a high stage of water, to avoid the delay of awaiting her turn through the locks at one of the dams, passed over the dam safely, but struck her tow against a bridge-pier a short distance below, and sunk one of her barges. *Held*, that the tow-boat was answerable.

3. SAME—SUIT IN REM BY BAILEES.
    The bailees of a barge injured by the negligence of a tow-boat may sue the wrong-doing vessel *in rem* in admiralty, and recover the full damages for the injury.

In Admiralty.

*Knox & Reed,* for libelants.

*Thomas C. Lazear,* for respondents.

ACHESON, J.   On the morning of February 5, 1883, the tow-boat Venture was descending the Monongahela river, having in tow two barges, one on either side of her, and three flats on the head of the barges, all loaded with coal; the width of the tow at the head being

60 feet, and the length of the tow and boat combined being about 340 feet. The river had risen to the height of 15 feet at dam No. 2. The Allegheny river was also high, and, being the master stream, had backed up the Monongahela river to the extent, it is shown, of 18 inches at a point 8 miles above dam No. 2. As a consequence, the current of the Monongahela was sluggish, and the witnesses think did not exceed one mile an hour above and at that dam. When the Venture reached the locks at dam No. 2, which, notwithstanding the height of the water, were working at about the usual speed, she there found two other boats which were entitled to precede her through the locks. To have awaited her turn would have delayed the Venture about one hour, which is not an extraordinary detention. But to avoid the delay, the master of the Venture, after assuring himself of the state of the water, determined to go over the dam instead of through the locks. He then believed it safe to do so, especially in view of the fact that two other descending tow-boats, each with some tow, had just pursued this course successfully. The Venture passed over the dam in safety, but she struck her tow—the head of the middle flat—against the second pier from the right-hand shore of the railroad bridge which crosses the river at the distance of about 550 feet below the dam. The flat was injured and sunk; and this suit is to recover damages for the loss of the coal which belonged to the libelants, and for the injury to the flat of which they were bailees, they being under contract to deliver it loaded with coal to the owner at Pittsburgh.

The libelants maintain that the Venture should have gone through the locks and not over the dam, which they contend was bad seamanship, causing the disaster; but if not, that then the tow-boat is chargeable with negligence in not avoiding the pier. The channel span of the bridge is between the first and second piers from the right-hand shore; and being a very short distance directly below the locks, descending boats, after coming out of the locks, have a straight and safe course down to and through this span. The outer wall of the locks extends in a straight line down the stream the distance of 230 feet from the dam, the lower end of the wall being but 322 feet from the span of the bridge; while the second pier stands only 60 feet further out in the river than this wall. Now, by reason of the height of the water, the Venture was unable—or was supposed by her master to be unable—to pass under the bridge by way of any of the spans other than the channel span; and to reach it after she had cleared the dam, it was necessary to turn her tow from a straight line and work over towards the right-hand shore. This maneuver she was essaying when she struck the pier. She had passed over the dam at the distance of 25 or 30 feet from the outer wall of the locks, with the second pier of the bridge directly in front of the head of her tow; and as the length of the tow and boat together was 340 feet, and the width not less than 60 feet, it is plain that her movements were confined to

very narrow limits. After her stern had cleared the dam the head of the tow could not have been more than 200 feet from the pier, and she had to work towards the shore so as to avoid the wall of the locks on the one hand and the pier of the bridge on the other. It is possible that the current was somewhat stronger immediately below the dam than above; and it was, perhaps, swifter than the witnesses think; but, whether so or not, it is not surprising that in the strait into which the Venture had rashly brought herself evil should befall her.

True, several experienced river men express the opinion that it was safe and prudent to pass over the dam in the then condition of the river. But these witnesses were not present at that time, and I think they overlook the dimensions of the tow, and do not sufficiently consider the necessity the Venture was under to reach the channel span. Undoubtedly the mere passage over the dam was safe enough, and perhaps would have been unobjectionable had the Venture been able to run any of the other spans of the bridge; but shut up as she was to the channel span, and with the tow she had to manage, it was for her a perilous undertaking. There was no necessity whatever for her departing from the customary mode of navigating the river at that place, to-wit, through the locks; and having voluntarily assumed a needless hazard, she must bear the consequences of her master's temerity.

I need only add that if the water was as sluggish as is claimed, and the passage over the dam a perfectly safe proceeding, then it is impossible to acquit the Venture of culpable negligence in striking the pier.

The evidence, I think, establishes the correctness in amount of the claim as set forth in the exhibit annexed to the libel. But it is contended that the libelants have no such interest in the flat as to recover in this suit for the damage to it, this being a proceeding *in rem* against the Venture. The libelants, however, as bailees of the flat, might have maintained an action at common law for these damages, (Ang. Carr. §§ 492, 493,) and no good reason is perceived for denying to such bailees the right to recover in admiralty full damages for an injury to property under bailment, whether the suit is *in personam* or *in rem*. And for this view there is judicial authority. *The Minna*, L. R. 2 Adm. & Ecc. 97. In the present case there is no danger that the Venture may be subjected to a further claim, for, whether bound to do so or not, the libelants have repaired the flat at their own expense.

Let a decree be drawn in favor of the libelants for the amount of their claim, with interest from February 5, 1883, with costs.